The next matter on our calendar is Petronio v. National Railroad Passenger Company. Good morning, counsel. May it please the court, good morning, your honors. My name is Steve Fitzgerald and I represent Steve Petronio. Of the four elements that a railroad employee's proof for a FRSA whistleblower retaliation claim, Amtrak challenges only one, the fourth element, namely whether the protected activity was a contributing factor in the adverse action. Mr. Petronio need only show that his protected activity was a contributing factor in the retaliatory adverse action, not the sole or even predominant cause. The term contributing factor means any factor which alone or in connection with other factors tends to affect in any way the outcome of the decision. Here, the district court granted summary judgment in favor of defendants Amtrak and Collins after concluding that Mr. Petronio's protected safety reports were not a contributing factor in the adverse employment action against him. The district court's conclusion was the product of at least four different errors. First, the court failed to view the facts in the light most favorable to the plaintiff. Second, the court ignored circumstantial evidence that satisfied the lenient proof burden applicable to contributing factor. Third, the court applied an incorrect burden of proof, erroneously putting on Mr. Petronio the burden of proving intentional retaliation. And fourth, the court allowed the use of a purely subjective criteria as the basis for the adverse actions taken against plaintiff. With time, I'd like to address all four of those errors. First, the district court failed to view the facts in the light most favorable to the plaintiff when it made the following three findings of fact. First, it found that Mr. Petronio did in fact commit Amtrak policy violations when he used the word ugly during an innocuous conversation with manager Hall, and then later that morning during a meeting in defendant Collins's office when in fact the evidence shows that it was Collins who was acting in an unruly manner. The second finding of fact made by the district court was that defendant Collins's motivation was free of any bias against Mr. Petronio's safety complaints. And the third finding of fact was that defendant Collins did not play a meaningful role in the adverse action taken against Mr. Petronio. Each of these improper findings of disputed fact the district court used to arrive at its conclusion that Mr. Petronio's protected activity was not a contributing factor in the adverse actions taken against him. Now, as to the finding of fact that there were Amtrak policy violations, the Amtrak managers themselves, as the record shows, conceded that there was no actual workplace violence. There was no threat of physical violence. There were no raised voices, no use of profanity. They all the managers admitted that they that they did not know what Mr. Petronio meant by the use of the word ugly. Mr. Petronio denied threatening any violence when he used the word ugly. And Amtrak's managers failed to act in a manner consistent with its own workplace violence policy. The district court also made a finding of fact that Mr. Petronio engaged in what it described as a heated exchange with Collins. And yet the evidence viewed in the light most favorable to Mr. Petronio shows that during this meeting in Mr. Collins's office, Mr. Petronio was seated the entire time and was barely allowed to speak while it was Mr. Collins who stood over him and yelled at him while defendant Collins addressed plaintiff in a threatening and disrespectful tone. Mr. Mr. Petronio did not reciprocate. When these facts are viewed in the light most favorable to Mr. Petronio, at the very least, it raises an issue for the jury to decide, not the district court. This error was compounded by the court's acceptance of Amtrak's use of purely subjective criteria as the basis for the adverse action. As for the finding of fact that Collins's motivation was free of any bias, it was clear error for the district court to decide the issue of Collins's intent in an employment retaliation summary judgment context. In Quan versus Andalux, the case we cited from this circuit from 2013 makes clear that the matter of motivation is left for the jury to decide, not for the district court. However, to arrive at this decision that Mr. Collins motivation was free of any bias, the court again had to ignore facts that it ignored that Mr. Collins failed to address and ignored the safety hazards brought to his attention, failed to fix them. It ignored the fact that Mr. Collins expressed annoyance at the manner in which Mr. Petronio raised the reports to his and his supervisor's level. It ignored the fact that Collins labeled the reports as odd. The court ignored the fact that Collins, contrary to the instructions of the disciplinary charging officer, denied Petronio the opportunity to explain what he meant by use of the word ugly. Finally, it ignores the fact that Collins suspended and charged Petronio within mere days of the protected activity. As the third day, you go back to what you said about subjective intent, you mentioned the factor, but could you just explain a little bit what you see as the error on that topic alone? Of course, your honor, in the in the employment contracts context and in an FRSA claim in particular, a an employee such as Mr. Petronio will never be able to prevail if the mere announcement of a subjective basis to take action against the employee is given deference by this court or or any court for that matter. So it's it's our position that in order to find that there was a policy violation, there needs to be both an objective and a subjective component. All they have here is a subjective component. Mr. Hall says, despite the fact that he is a larger man than Mr. Petronio, despite the relatively innocuous behavior of the conversation that morning, he says, I feared for my safety. Well, even Amtrak's policy says that fear must be reasonable. Now, the question of what's reasonable in order to fit that objective component is always a question that we reserve for the jury and not a question that can be resolved on summary judgment. So it's our view further that the record is absolutely clear based on the testimony of the of the charging manager, Ms. Obey, who sort of proudly announced that Amtrak's workplace violence policy is purely subjective. It gives exclusive authority to some 50 managers to decide whether or not a report or an act is a violation of a workplace of the workplace violence policy. And I'm sorry, you're making your point that it must be the objectively reasonable. Is your point that objective reasonableness in this context is a jury question? Yes. Yes. I see my time's running low, so I want to address one other issue. I asked, is there a case that says that objective reasonableness in this context is a jury question? In in our brief, I'm sorry, your honor. All right. If it's there, I'll find you think it's in your brief. Yeah, I think it's in our brief. And it's both Second Circuit authority as well as authority that addresses specifically the FRSA claim. If you're wrong on that, are you in trouble? No, your honor, frankly, we prevail if we prevail, if this panel determines that the district court wrongly engaged in fact finding, which I think I've laid out clearly that has taken place here. We also prevail if the district court failed to address the circumstantial evidence that is abundantly described five different varieties of circumstantial evidence that's abundantly described in our briefing. So while objective, the need for an objective standard, in addition to the asserted subjective standard, is supported by the case law cited in our brief. I think we prevail, nevertheless, even if this panel does not address that issue. Thank you, counsel. Thank you. We'll hear from National Railroad passenger. Thank you, your honor. William Blaine for National Railroad and John Collins, if it please the court. We're talking here ultimately about two elements that we think as a matter of law, the judge correctly decided entitled the defendants to summary judgment. That first element is simply whether the employer knew or had I'm sorry, had actual or constructive knowledge that in this case, Mr. Petronio had engaged in protected activity. If there was no active, actual or constructive knowledge, then this claim fails. Period. We don't have to get into any of these other issues. Fact of the matter is that this court has said in the Vasquez case, which is not an FRSA case, but I think is still relevant to the test here, that what this first element really means is that a plaintiff has to show negligence by the employer to justify saying, OK, maybe you didn't have actual knowledge that there was protected activity involved here, but you should have known. The second element that is in play here, and we think authorized summary judgment was looking at all the facts and circumstances. Can there is there enough for a jury to reasonably infer that. OK, at least some piece of the adverse action that was taken in this case, termination was attributable to protected activity. Let's go to the first, the important negligence issue. You can look at all the things that that my opposing counsel put in his brief and everything he said, and you're not going to find anything that would explain why it was that Amtrak was negligent for not appreciating that apparently there was protected activity than the plaintiff's view could be part of the explanation for why he was subjected to termination. They don't have anything. They didn't raise it at any time. And there's no reason why any of the actual decision makers in this case would have known that there was any remote involvement of something called. Sorry, I apologize to your honors. Yeah, protected activity. How's that for losing your train of thought? Sorry. So, you know, that's important. We had we we laid out all the fact finders here, all the decision makers rather. Crash, Ober, Keefe, Pusilovsky, we all of them said, you know what, I didn't know anything about protected activity and they don't have anything to rebut that. All right. So now the question is, oh, but should they have known? And I don't think they've ever given me and given us an explanation as to why they should have known. The best I can I can put together is that their argument would be that Collins's behavior at the second session, when, according to Petronio, Collins was rude and talked over him, of course, that's the opposite of what what Collins says. But, you know, that was that was what was alleged by Petronio, that because he was rude and stuff, that maybe that should have raised a question in the minds of the of the decision makers. Wait a minute. Should we check into, you know, why is Collins being so aggressive with this guy? Well, a simple answer is that if they had raised that question, they would have gone to the gentleman who was in the room with both Collins and Petronio at the time, T.J. Hall. And T.J. Hall, in deposition, basically was down the line in agreeing with Collins's version of what Petronio said. And he, who reads that, would conclude that, of course, he was challenging. He was rude. He was disruptive, and he wouldn't let Collins try to get a resolution of this thing. What was one of his remarks, according to Hall, what are you going to do about it, Collins? So the point would be simple. They have to show negligence in order to satisfy that first element that I've mentioned, and they don't have it. There is no negligence. Now, that'll get you, let's get to the second element, which is the business of, okay, even if we assume that there was, you know, what's the evidence that there was any remote involvement of the issue of safety reports in the decision that was reached? And we respectfully submit that there is nothing in the record that would support finding that. And if there were anything in the record that could support that in any way, then we still prevail on the alternative ground that the which is a clear and convincing evidence would show that Amtrak would have taken the same action against Mr. Petronio if he had not engaged in any protected activity. The fact of the matter is here, we're talking about protected activity because it consisted of nothing more than a blast of emails. I think I listed it in the- Well, what more would he have to do? A blast of emails. That's how people communicate. Well, I'm sorry to say that's true, Your Honor. The point would be that there is an obvious and big difference between me going to my supervisor and raising an issue which puts it on that supervisor, all right, to address it or to pass it along to somebody else. When you get a blast of emails, which we had here, in most of which I think he actually- Collins was just a CC. When you get a blast of emails, does that mean everybody has the same obligation that they would have if actually it was done in the traditional way you'd ordinarily make a claim, which is go right to your supervisor and raise the issue with that supervisor and then follow up with the supervisor? Look, he's absolutely entitled to do a blast, and frankly, he did it because he's the local chairman. I mean, I'm sure he thought that that was his job, and I don't have a quarrel with that, but I don't think that by sending out a blast of emails, you suddenly find protection for yourself when later on it turns out you do something wrong that clearly has nothing to do with protected activity. I don't think there's any dispute in this case that the charge or, excuse me, what precipitated the charge here was a discussion about pumping that has nothing to do whatsoever with safety. Counsel, if we were to agree with you that the record does not support a safety violation as a contributing factor, but we also thought the judge exceeded summary judgment standards in thinking that there was a threat that warranted discharge, what would the remedy be in this court, if any? What would the remedy be? I candidly, Judge, it doesn't make sense to me that it should be a jury trial. But what would it be on? In other words, if the only thing left in the case is whether he was a threat that justified discharge, is that just a matter for arbitration? See, yeah, I absolutely think it's a matter for exactly what happened here, which is that you get a finding by, this is all pursuant to rule either 21 or 23 that was worked out with the union, was described as fair and partial proceeding. The proceeding says that it's up to the hearing officer in the first place to make a determination. It then goes up through labor relations. And in the end, pursuant to the RLA procedures, it gets decided where you've got a neutral arbitrator. And as your honor, I'm sure knows from reading the arbitration decision, neutral arbitrators had no problem saying there's enough here, there's substantial evidence here, based on the facts that would support finding that it made the objective test. And I will say, our standard was an objective standard. Yeah, well, that's what I'm wondering, because you started and made your initial argument on the basis that the company did not know about the safety issue. But then you said, even if they did, or assuming you went on, and that's why I'm wondering where the case is if they did know. But your basic position is, there's no evidence they did know. Correct. And that's where the case should end. Yes. Yes. And I do want to emphasize what I think we said in our brief, and we cited a not an FRSA case, but we also cited a couple of Eighth Circuit cases. The task of the court under the law in these cases is not to decide the ultimate correctness of the facts. It's not to decide, gee, did the guy just say ugly, or did he say ugly for you? It's not to decide, did Petronio initiate the squabbling with Collins, or did Collins initiated? The task is to look and determine, were the determinations that were made, made honestly? And so if as a matter of law, somebody were to say you couldn't possibly make that finding, I don't think that's the job. And on your point that the company has, well, let me start again, as to whether there is constructive knowledge on the part of the company of a safety issue, is your point that there is no evidence to support that, or that there is no such question that by definition, and I think Vasquez spells that out, that when we're talking about constructive knowledge, it's a new or should have known. So either they should have known, or they didn't. There was no obligation. You're not saying there's no room for the doctrine of constructive knowledge on safety. You're just saying there's no evidence to support it. Exactly. That if you say, okay, where's the negligence? I don't know where they're going to look. Thank you, counsel. Mr. Fitzgerald, you have reserved two minutes for rebuttal. Unmute yourself. I did, your honor. Thank you. Thank you so much. Well, first of all, it sounded for a moment as if attorney Belayne and I were going to arrive at agreement here. It sounded as if attorney Belayne was saying that it's really not for the district court to decide these issues as to what happened on November 7th and whether or not that's mere pretext or whether this is retaliation. I agree. It's for the jury to decide. Don't be too quick to find agreement because at least on the he was quite clear. He thinks there's no evidence. And so I'm going to give you a chance to tell us what evidence you think is in the record. Sure. There's absolutely evidence in the record, not only of constructive knowledge, but of actual knowledge. The key here is Mr. Collins. Mr. Collins received the emails reporting the safety hazards. There's testimony of discussions between Mr. Collins and Mr. Petronio about the safety hazards. And then critically important, it was Mr. Collins who played the crucial role in bringing about the adverse actions against my client. It was Mr. Collins who suspended my client. It was Mr. Collins who initiated the disciplinary charges against my client. And it was Mr. Collins who gave the critical testimony in the Amtrak hearing that resulted in the termination of my client. So we don't even have to get into the question of constructive knowledge. We have actual knowledge. What Amtrak's argument was before the district court was that the ultimate decision makers, Ms. Kirsch, who ultimately made the decision upon reviewing the hearing transcript to terminate my client, that she was removed from a level of knowledge. And that's where the cat's paw circumstantial evidence comes into play. And we would strongly urge this panel to make it clear that cat's paw evidence to show the connection between the one who initiated the disciplinary action and the manager who completed it by deciding on termination, that that connection is made with that category of circumstantial evidence that's known as cat's paw. Just a couple of other things real quick because I see my time is up. The CBA does not address, that is the collective bargaining agreement, does not address rights under the FRSA statute which provides my client for the no vote trial in district court. By no means should any court, by no means should the Second Circuit Court of Appeals defer to findings made in CBA hearings when it comes to my client's rights under the FRSA. Thank you. Thank you. Thank you both. We will reserve decision.